**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210084-U

Order filed August 3, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* S.E., M.E., T.W., and C.R., | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| Minors | ) | Rock Island County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | Appeal Nos. 3-21-0084, 3-21-0085, |
| | ) | 3-21-0086, and 3-21-0087 |
| Petitioner-Appellee, | ) | |
| | ) | Circuit Nos. 15-JA-33, 15-JA-34, |
| v. | ) | 15-JA-61, and 18-JA-77 |
| | ) | |
| Tikesha W., | ) | The Honorable |
| | ) | Theodore G. Kutsunis, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices O'Brien and Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  In an appeal in a termination of parental rights case, the appellate court held that the trial court's determination of parental unfitness and best interest were not against the manifest weight of the evidence.  The appellate court, therefore, affirmed the trial court's judgment, terminating the biological mother's parental rights to her minor children.

¶ 2    In the context of a juvenile-neglect proceeding, the State filed petitions to involuntarily

terminate the parental rights of respondent mother, Tikesha W., to her minor children, S.E.,

M.E., T.W., and C.R. After hearings on the matter, the trial court found that respondent was an unfit parent/person and that it was in the children's best interest to terminate respondent's parental rights. Respondent appeals, challenging both the determination of parental unfitness and best interest. We affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        Respondent was the biological mother of the minor children, T.W. (born in October 2005), S.E. (born in April 2013), M.E. (born in April 2014), and C.R. (born in October 2018). The children had different fathers. Timothy T. was the father of T.W.; Andre E. was, or was believed to be, the father of S.E. and M.E.; and Christian R. was the father of C.R. In June 2015, three years before C.R. was born, the family came to the attention of the Department of Children and Family Services (DCFS) after the police discovered during a welfare check that respondent had left S.E. (age two at the time) and M.E. (age one at the time) alone in her apartment. A neighbor had reported that the children had been crying in the apartment for over an hour. The children were not wearing any clothes, except for heavily soiled diapers. The police took the children to the police station and did not hear from any member of the children's family for several hours. Protective custody of S.E. and M.E. was subsequently taken.

¶ 5        A few days later, the State filed juvenile petitions, alleging that S.E. and M.E. were neglected minors based upon the above incident. Respondent was given a court-appointed attorney to represent her in the juvenile court proceedings.

¶ 6        When the above incident occurred, respondent's oldest child, T.W., was living with T.W.'s father, Timothy T. About three months after the incident, respondent picked T.W. up from Timothy's residence for a visit but had no intention of returning T.W. DCFS later learned that T.W. was in respondent's care and assigned an investigator to look into the situation to

2

determine if there were any potential safety issues since respondent already had other children in DCFS care. Respondent, however, refused to produce T.W. for the DCFS investigator and, instead, hid T.W. with a friend. DCFS was eventually able to obtain protective custody of T.W. after respondent enrolled T.W. in school. After DCFS did so, T.W. disclosed to DCFS that her father had sexually abused her; had exposed her to alcohol, drugs, and guns in the home; had been leaving her at home unattended and without a phone until 2 or 3 a.m.; and had been physically abusing her with a belt for discipline.

¶ 7    The following month, the State filed a juvenile petition, alleging that T.W. was an abused and neglected minor based upon the above incidents. The same attorney was again appointed to represent respondent in the juvenile court proceedings.

¶ 8    In December 2015, a pretrial conference was held on respondent's cases regarding her three children. Respondent was present in court for the pretrial conference and was represented by her attorney. Respondent stipulated to the facts alleged in the juvenile neglect petitions, except for the allegations regarding the abuse of T.W. by T.W.'s father, and the State agreed to dismiss those allegations.

¶ 9    On January 8, 2016, a dispositional hearing was held. At the conclusion of the hearing, the trial court found that all three children were neglected and that respondent was unable to care for the children because she had stipulated to the facts alleged in the neglect petitions and had not yet completed the services that were necessary to have the children returned to her care. The trial court made the children wards of the court and named DCFS as the children's guardian. The permanency goal was set at that time for the children to be returned home within 12 months. In the dispositional orders, respondent was instructed that she was required to comply with the service plan that was implemented and to correct the conditions that caused the children to be in

3

care or that she would risk the termination of her parental rights. As part of the service plan and through a separate court order, respondent was given the following tasks to complete to correct the conditions that led to the adjudication and removal of the children: (1) cooperate with services and service providers and follow the service plan; (2) obtain and maintain appropriate housing; (3) obtain and maintain appropriate income; (4) complete a mental health evaluation and comply with the recommendations contained therein; (5) attend and successfully complete parenting classes; (6) attend family and individual counseling; and (7) complete domestic violence services.

¶ 10   Over the next several years, numerous permanency review hearings were held in this case. The first permanency review hearing took place in June 2016. Respondent was present in court for the hearing and was represented by her attorney. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had been attending individual and family counseling sessions; (2) respondent had participated in a parenting-capacity assessment; (3) respondent had participated in counseling in her home (presumably parenting training); (4) respondent was currently working full time at a fast food restaurant; and (5) respondent was attending scheduled visits with the children. As for the negative aspects of respondent's performance, the report indicated that: (1) respondent would often deny the statements that T.W. had made in counseling but later, after more information was given, would end up admitting that what T.W. had stated was true; (2) the care team was often concerned about respondent's ability to bond with the children, to provide ongoing safety for the children, and to be able to manage life and responsibilities; (3) although respondent participated in counseling in her home (presumably parenting training), she did not seem to be able to utilize the skills she had been

4

taught; (4) respondent continued to have a fear of the children being sexually abused by their current caregivers even though there was no evidence supporting that concern; (5) the team had to limit the number of diaper changes that respondent would perform during her visits with the children as it was promoting a fear within the children; (6) although respondent was participating in services, the team continued to have ongoing concerns with her ability to parent the children, provide safety, and meet the children's needs on a consistent basis; and (7) although respondent was cooperative with service providers, she continued to exhibit behaviors that were of a concern for the team to be comfortable with her parenting the children full time. After considering the service plan, the caseworker's report, and any testimony and arguments presented, the trial court found that respondent had made reasonable efforts toward return of the children home but had only made minimal progress in that regard. The trial court kept the permanency goal at returning the children home within 12 months.

¶ 11        A second permanency review hearing was held in March 2017 (continued from January 2017). Respondent was present in court for the hearing and was represented by her attorney. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had satisfactorily completed the mental health evaluations that had been requested, although respondent did not believe what the evaluations stated; (2) respondent had cooperated to some extent with her goals and services; (3) respondent had obtained or been provided with a new apartment after she had lost her previous apartment; and (4) respondent was looking for new employment after she had lost her previous employment. As for the negative aspects of respondent's performance, the report indicated that: (1) respondent had been unstable during the reporting period; (2) respondent had lost her housing and had ended up in a shelter; (3)

respondent was unemployed; (4) respondent was not fully cooperating with the expectations of counseling and visits; (5) respondent had not been able to demonstrate on an ongoing basis some of the parenting skills she had been taught; (6) respondent had missed the last two child and family team meetings for no apparent reason; (7) respondent provided dishonest or embellished information to her service providers or caseworker; (8) respondent was late to visits with the children for no reason but would often make excuses; (9) respondent had a lack of understanding as to her children's needs, would insist on going into the restroom with S.E., and would often ask the children if anyone was touching or hurting them; (10) although respondent attended counseling, her progress was unsatisfactory as she was not implementing what she had learned and continued to do things that were against the team's recommendations; and (11) respondent continued to exhibit behaviors that were of concern to the team. The caseworker recommended in her report that the permanency goal for the children be changed to substitute care pending a court determination on termination of parental rights (a court ruling on termination). After considering the service plan, the caseworker's report, and any testimony and arguments presented, the trial court found that respondent had not made reasonable efforts or reasonable progress. The trial court elected, however, not to change the permanency goal at that time and kept the permanency goal at returning the children home within 12 months.

¶ 12        A third permanency review hearing was held in July 2017. Respondent was present in court for the hearing and was represented by her attorney. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated, although somewhat implicitly at times, that: (1) respondent had maintained an apartment (housing); (2) respondent had obtained employment, but only for a short period; and (3) respondent was making a better effort during visits to get the children to

listen to her, although her efforts were ultimately unsuccessful. As for the negative aspects of respondent's performance, the report indicated that: (1) respondent's mental health had deteriorated to the point where the counselor did not think that respondent was mentally stable (respondent was talking about the devil in one visiting session and had accused the caseworker of being evil); (2) respondent had refused to attend individual or family counseling because she did not agree with the feedback the counselor was giving her; (3) respondent had lost her job after being employed for only a short period; (4) respondent had missed several visits with the children; and (5) although respondent had maintained an apartment, she did not have adequate furniture. After considering the service plan, the caseworker's report, and any testimony and arguments presented, the trial court found that respondent had not made reasonable efforts or reasonable progress, although respondent had made minimal efforts. The trial court again, however, declined to change the permanency goal and kept it at returning the children home within 12 months.

¶ 13　　　　A fourth permanency review hearing was held in November 2017 (continued from October 2017). Respondent was present in court for the hearing and was represented by her attorney. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had maintained the same residence; (2) respondent had obtained some furniture for her residence; (3) respondent had maintained stable part-time employment for a portion of the period; (4) respondent had seen the doctor, had been prescribed medication for bipolar disorder, and had been consistent with her medication; (5) respondent had attended all of her visits with the children; (6) respondent had started counseling with a new service provider and had been attending her counseling sessions; and (7) respondent had been seeing a community support

7

worker and an employment worker. As for the negative aspects of respondent's performance, the report indicated that: (1) respondent was unemployed for a portion of the period; (2) respondent still needed to obtain furniture for the bedrooms of her residence; (3) respondent often embellished her reporting of her progress on services; (4) respondent missed two child and family meetings with DCFS and providers; (5) the staff members that monitored respondent's visits with the children were still concerned at times with safety issues and had to give respondent consistent prompts to that effect; (6) respondent had difficulty getting the children to listen to her during visits; and (7) although respondent loved the children, she was still unable to demonstrate effective parenting with all three children at one time to ensure their safety. The caseworker recommended in her report that the permanency goal for the children be changed to substitute care pending a court ruling on termination. After considering the service plan, the caseworker's report, and any testimony and arguments presented, the trial court found that respondent had made reasonable efforts and reasonable progress and kept the permanency goal the same (returning the children home within 12 months).

¶ 14      A fifth permanency review hearing was held in May 2018. Respondent was present in court for the hearing and was represented by her attorney. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had maintained her housing (implicit in the report); (2) respondent had maintained her part-time employment (implicit in the report); and (3) respondent had consistently attended visits with her children and the visits, which were supervised, had generally gone well. As for the negative aspects of respondent's performance, the report indicated that: (1) respondent had been involved in another dating relationship where domestic violence was present (respondent's relationship with Christian R.) and had lied about

that relationship to her caseworker; (2) although respondent's visits with the children went well, respondent's conversations with T.W. were, at times, inappropriate; (3) respondent had not been able to consistently demonstrate that she was able to keep her environment safe for her children as evidenced by her ongoing domestic violence relationship with Christian; (4) although respondent had obtained an order of protection against Christian, she had later dropped the order of protection and had continued her relationship with Christian; (5) respondent had not been able to consistently provide her children with basic items for visits, such as food and toilet paper; (6) respondent had not consistently attended her mental health appointments or followed through with the therapy component of her treatment; (7) overall, respondent had not shown an improvement in parental choices or decisions to lead to a safer and healthier environment for her children; (8) respondent had not been able to build an ongoing support network for herself; and (9) although respondent clearly loved her children, she had not been able to demonstrate her ability to parent the children safely full time. The report also indicated that respondent was currently pregnant with Christian's child. The caseworker recommended in her report that the permanency goal for the children be changed to substitute care pending a court ruling on termination. After considering the service plan, the caseworker's report, and any testimony and arguments presented, the trial court found that respondent had not made reasonable efforts or reasonable progress but had made minimal efforts. Due to the lack of efforts and progress by the children's parents, the trial court changed the permanency goal to that recommended by the caseworker.

¶ 15      As noted above, in October 2018, respondent gave birth to C.R. At the time of delivery, respondent admitted that she had an open DCFS case. The DCFS hotline was called, and a DCFS investigator visited respondent and C.R. at the hospital. Respondent was reported to have

9

acted appropriately with C.R. and no concerns were noted within the hospital. DCFS, therefore, decided to allow respondent to take C.R. home and to care for C.R. with various agencies providing services and support to the family. About three weeks later, however, DCFS removed C.R. from respondent's care after it was reported that respondent appeared to be highly intoxicated while acting as C.R.'s caregiver. The child's father, Christian, took C.R. from respondent's apartment at that time because he was concerned for C.R.'s safety. Although the police responded to respondent's apartment and observed that respondent appeared intoxicated, had slurred speech, and was swaying, respondent denied to her caseworker that the incident had occurred and stated that Christian had kidnapped C.R. from her apartment. The State later filed a neglect petition as to C.R. based upon that incident and certain other matters.

¶ 16       A sixth permanency review hearing was held in November 2018. Respondent was present in court for the hearing and was represented by her attorney. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had maintained her housing; (2) respondent had attended her visits with the children and the majority of those visits had gone well; (3) respondent had initially been allowed additional visits with her children with less supervision; (4) respondent had initially been allowed to take C.R. (the new baby) home and to care for C.R. in her home; (5) respondent had reached out to different agencies for assistance with her electric bill after she had received a shut-off notice; and (6) respondent worked well with service providers at times. With regard to respondent's employment for the period, the report noted that respondent had been unable to work due to her high-risk pregnancy. As for the negative aspects of respondent's performance, the report indicated that: (1) DCFS had removed C.R. from respondent's care after the incident where it was reported that respondent was

intoxicated while caring for the child; (2) the level of supervision for respondent's visits with the children was increased after the incident with C.R.; (3) although the majority of visits went well, respondent had a couple of visits that caused staff to have concerns when she tried to physically discipline the children by slapping M.E.'s hand and by pulling T.W.'s hair; (4) respondent was still having inappropriate conversations with T.W. during visits; (5) respondent was accusing T.W. of sexually abusing the younger children, despite there being no evidence thereof; (6) respondent had still not been able to consistently demonstrate that she was able to keep her environment safe for her children; (7) although respondent worked well with service providers, she only did so if her tasks were not challenging and did not go against what she wanted to do; (8) respondent had still not been able to consistently provide her children with basic items without help from agencies; (9) overall, respondent had not shown an improvement in parental choices or decisions to lead to a safe and healthy environment for her children; (10) although respondent stated that she was taking responsibility for her actions, she had continued to make the same poor choices; (11) respondent had still been unable to build an ongoing support network for herself; and (12) although respondent clearly loved her children, she still had not been able to demonstrate her ability to parent them safely full time. The caseworker recommended in her report that the permanency goal for the children be kept at substitute care pending a court ruling on termination. After considering the service plan, the caseworker's report, and any testimony and arguments presented, the trial court found that respondent had not made reasonable efforts or reasonable progress and kept the permanency goal the same (substitute care pending a court ruling on termination).

11

¶ 17        In May 2019, the State filed its initial petitions to terminate respondent's parental rights as to three of the four of children: TW, S.E., and M.E.[1] The petitions were later amended. In the amended petitions, the State alleged that respondent was an unfit parent/person as defined in the Adoption Act because: (1) she had failed to maintain a reasonable degree of interest, concern, and responsibility as to the children's welfare (see 750 ILCS 50/1(D)(b) (West 2018)); (2) she had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children from her during any 9-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) she had failed to make reasonable progress toward the return home of the children during any nine-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(ii) (West 2018)) in that she had failed to consistently engage in counseling, had failed to consistently engage in mental health services or comply with recommendations, had failed to consistently ensure safety or implement skills learned from parenting and counseling during her visits with the children, and had failed to maintain employment. In the amended petitions, five nine-month periods were specified as to the second and third allegations: January 9, 2016, through October 9, 2016; October 10, 2016, through July 10, 2017; February 28, 2018, through November 28, 2018; November 29, 2018, through August 28, 2019; and August 29, 2019, through May 29, 2020.

¶ 18        In July 2019, a partial adjudicatory hearing was held on the neglect petition that had been filed as to C.R. Respondent was present in court for the hearing and was represented by her attorney. C.R.'s father, Christian, stipulated to the facts alleged in the petition. Based upon Christian's stipulation, the trial court granted the petition and continued the case for actual adjudication of C.R. and for disposition.

---

[1] The petitions were labeled "SUPPLEMENTAL" petitions.

¶ 19        The following month, Christian filed a motion to vacate his stipulation to the facts forming the basis of the neglect petition as to C.R.  The trial court later denied Christian's request.

¶ 20        A seventh permanency review hearing was held in November 2019.  Neither respondent nor the attorneys were present in court for the hearing.  A report had been prepared for the hearing by the caseworker.  As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had maintained her housing; (2) respondent had participated in an employment program through her counseling provider; (3) respondent had obtained employment; (4) respondent had participated in a community support program through her counseling provider; and (5) although respondent had missed numerous visits with the children for various reasons, she was able to make up those visits.  As for the negative aspects of respondent's performance, the report indicated that: (1) respondent had difficulty paying her electric bill and had her electricity shut off for a period of time; (2) although respondent had obtained employment, she had difficulty maintaining a job for more than a few months; (3) respondent was still involved in her relationship with Christian, despite periods of domestic violence; (4) respondent's mental health problems had intensified after her children's cases had moved toward termination; (5) respondent had left a voicemail on T.W.'s phone stating that she was going to harm herself; (6) respondent had been hospitalized and had received a psychiatric evaluation during the period for believing that her children were dead and that someone was trying to kill her; (7) although respondent had participated in a community support program, she had missed several appointments; (8) after C.R. was taken into DCFS care, respondent began to display unpredictable behavior; (9) respondent's visits had been reduced due to her behavior; (10) respondent had missed numerous visits due to weather conditions, being ill, the children

13

being ill, and respondent being in jail; and (11) respondent had failed to consistently attend mental health counseling appointments. The caseworker recommended in her report that the permanency goal for T.W., S.E., and M.E. be kept at substitute care pending a court ruling on termination. After considering the service plan and the caseworker's report, the trial court kept the permanency goals for the children consistent with the caseworker's recommendations. The trial court made no findings as to whether respondent had made reasonable efforts or reasonable progress for the period.

¶ 21      In January 2020, a dispositional hearing was held on the neglect petition pertaining to C.R. Respondent was present in court for the hearing and was represented by her attorney. At the conclusion of the hearing, the trial court found that C.R. was neglected and that respondent was unable to care for C.R. based upon the allegations in the neglect petition. The trial court made C.R. a ward of the court and named DCFS as C.R.'s guardian. The permanency goal was set at that time for C.R. to be returned home within 12 months. In the dispositional order, respondent was instructed that she was required to comply with the service plan that was implemented and to correct the conditions that caused C.R. to be in care or that she would risk the termination of her parental rights. As part of the service plan and through a separate court order, respondent was given the following tasks to complete to correct the conditions that led to the adjudication and removal of C.R.: (1) cooperate with services and service providers and follow the service plan; (2) obtain a substance abuse evaluation and follow any recommendations contained therein; (3) obtain a psychiatric evaluation and follow and any recommendations contained therein, including taking medication as prescribed; (4) cooperate with mental health counseling; (5) obtain and maintain appropriate housing; (6) obtain and maintain appropriate

14

income; (7) obtain a domestic violence assessment and follow any recommendations contained therein; and (8) attend and successfully complete parenting classes/parenting training.

¶ 22     An eighth permanency review hearing was held in April 2020. Presumably due to the pandemic, neither respondent nor the attorneys were present in court for the hearing. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had maintained housing and had obtained assistance in paying her utility bills; (2) respondent had maintained the same employment for six months; (3) respondent had consistently attended and participated in counseling to address her mental health and had consistently taken the medications she had been prescribed; (4) respondent had participated in a community support program through her counseling provider; (5) respondent had completed domestic violence classes and had been working with her counseling provider to understand the cycle of abuse; (6) respondent had consistently worked with a parenting coach; (7) respondent had attended her visits with the children (or made up visits she had missed) and her visits had generally gone well; and (8) respondent had made some progress in her parenting. As for the negative aspects of respondent's performance, the report indicated that: (1) although respondent had denied that she was in a romantic relationship with Christian (C.R.'s father), DCFS had received information that respondent had been dishonest about her interaction with Christian; and (2) although respondent had a loving relationship with her children and her visits had generally gone well, she had still struggled with disciplining the children and did not discipline the children during visits unless she was prompted to do so. The caseworker recommended in her report that the permanency goal for T.W., S.E., and M.E. be kept at substitute care pending a court ruling on termination and that the permanency goal for C.R. be kept at return home within 12 months.

After considering the service plan and the caseworker's report, the trial court found that respondent had not made reasonable efforts or reasonable progress and kept the same permanency goals in place as recommended by the caseworker.

¶ 23    A ninth permanency review hearing was held in September 2020. Respondent was present in court for the hearing and was represented by her attorney. A report had been prepared for the hearing by the caseworker. As for the positive aspects of respondent's performance during the period, the report indicated that: (1) respondent had maintained housing; (2) respondent had attended her counseling sessions to address her mental health; (3) respondent had participated in a community support program and an employment program at her counseling provider; (4) respondent had continued to work with a parenting coach; and (5) respondent had attended all of her visits with the children (either in person or through Facetime), except for one visit that was cancelled due to respondent's mental health issues. As for the negative aspects of respondent's performance, the report indicated that: (1) respondent had been acting strangely at her work and had eventually lost her job; (2) respondent had displayed bizarre behavior at one of her visits with the children; (3) respondent eventually had to be hospitalized for her mental health; (4) respondent had admitted to interactions with Christian, although there had not been any altercations between the two for the past six months; and (5) although respondent had the desire to change her parenting style and her relationship with the children, she had only made minimal progress with her parenting coach and had still struggled with the basic techniques of parenting. The caseworker recommended in her report that the permanency goals for the children be kept the same. After considering the service plan, the caseworker's report, and any testimony and arguments presented, the trial court found that respondent had not made

16

reasonable efforts or reasonable progress and kept the children's permanency goals the same, as the caseworker had recommended.

¶ 24    In November 2020, at the trial court's request, T.W. submitted a letter to the court to provide her feedback and wishes regarding the progress of the case, her future visits with respondent, and her future relationship with respondent. In the letter, T.W. expressed concern over respondent's ability to take care of T.W. and her siblings. According to T.W., from the time that she was six years old, she had observed a repeating pattern of behavior in respondent whereby respondent would be doing well for a couple of months and then everything would come "crashing down." T.W. stated in her letter that she loved respondent, but that she did not think it was good idea for her and the other children to be returned to respondent's care. T.W. believed that she and her siblings had found a stable home with a family that accepted and loved them and asked the trial court to bring an end to the chaos and court process that she and her siblings had been living through for the last several years. A report filed by the guardian *ad litem* that had been appointed for the children echoed T.W.'s concerns.

¶ 25    In December 2020, the State filed a petition to terminate respondent's parental rights to C.R.[2] The petition for C.R. generally mirrored the petitions (and amended petitions) that had been filed as to the other three children with the same three bases of parental unfitness alleged. The only nine-month period specified in C.R.'s petition, however, was the period from January 18, 2020, through October 18, 2020.

¶ 26    In January 2021, an evidentiary hearing was held on the parental fitness portion of the termination petitions (the amended petitions as to S.E., M.E., and T.W. and the original petition as to C.R.). Respondent was not present in court for the hearing due to mental health issues, but

---

[2] The petition was labeled a "SUPPLEMENTAL" petition.

her attorney was present in court to represent her interests. At the hearing, the State asked the trial court to take judicial notice of the children's birth certificates, which had been submitted previously, and all of the prior reports that had been filed in the case.

¶ 27　　　　During its portion of the hearing, the State called the caseworker, Lela Donaldson, to testify as its only witness. Donaldson testified that she had been the caseworker for the children's cases since September 2018 and was familiar with the history of the children's cases. According to Donaldson, the services that respondent was initially expected to comply with were to: (1) complete an integrated assessment; (2) maintain housing; (3) maintain income; (4) participate in therapy; (5) complete a mental health assessment; and (6) complete parenting education.

¶ 28　　　　As for housing, when Donaldson became the caseworker, respondent was living in an apartment complex where the amount of rent she paid was based upon her income. The apartment had two bedrooms and had enough space for the children if the children were ever returned to respondent. Since respondent was not working at the time, she did not have to pay any rent. In addition, respondent was given a stipend to pay for her utilities. Respondent had performed well in maintaining her housing and utilities while Donaldson had been the caseworker, although respondent needed assistance paying her electric bill on a few occasions when she had used the utility stipend incorrectly.

¶ 29　　　　About a month before the current hearing, however, respondent had been asked to move out of the apartment complex because all of the chaos she had been causing with emergency personnel (police, fire, and/or ambulance personnel) having to respond and because of the possible danger that she posed to neighbors. During one particular incident, which Donaldson described, respondent had tried to light her cigarette using her stove and had left her stove on

18

with a pot on top that had started to smoke very badly. Respondent had apparently fallen asleep at the time. The fire department was called to the complex and had to bust respondent's door down to get into the apartment. With Donaldson's assistance, respondent had since moved to a residential facility that helped clients with medication management. At the residential facility, respondent was not currently cooperating, was not taking her medications as directed, was not following-up with group sessions, was yelling and argumentative, and was isolating herself by staying in her room. Donaldson did not believe that respondent would be stable enough to be discharged from the residential facility any time soon. Despite that testimony, Donaldson later acknowledged on cross-examination that during all of the nine-month periods specified and the case as a whole, respondent had maintained satisfactory housing.

¶ 30    With regard to employment, during Donaldson's time as the caseworker, respondent's employment had been sporadic. About four months before the current hearing, respondent lost her job at McDonald's where she had worked for about a year, which was the longest time that respondent had worked at the same place since Donaldson had been the caseworker. Respondent lost the McDonald's job because she had too many absences and appeared to be drunk at times at work. Prior to the McDonald's job, respondent was usually at a job for only a brief period of time (two or three weeks) or was in-between jobs.

¶ 31    Donaldson acknowledged in cross-examination, however, that despite respondent's sporadic employment, respondent had sufficient income, either through her own employment or through assistance from the State or County, to support herself during all of the nine-month periods specified and during the case as a whole. Respondent may have also had sufficient income to support the children (meet the children's needs financially) during the time period when she was able to hold onto her job for a year.

¶ 32    As for respondent's parenting training and parenting ability, Donaldson indicated that respondent was initially referred to a group parenting class but was eventually switched to individual parenting instruction at Monarch Trauma Counseling Center. In about December 2018, the individual parenting counselor at Monarch reported that respondent was not making any progress. The counselor and the visitation supervisors tried to get respondent to understand how her mental health affected her children, how to have appropriate conversations with her children, effective parenting, and effective disciplining. It was always very argumentative between respondent and the individual counselor at Monarch because respondent did not agree that she had an issue as far as her parenting was concerned. In addition, respondent had previously been discharged by her parenting coach due to problems the coach had trying to get respondent to engage in coaching time but had started working with a new parenting coach in February 2020.

¶ 33    Donaldson acknowledged in cross-examination, however, that despite any problems with respondent's parenting training, respondent continued with the parenting training throughout the entire duration of the case. The only time respondent was not engaging in parenting training as well as DCFS would have liked was when respondent was doing one-on-one parenting through Monarch and was not being consistent in going to her appointments. In Donaldson's opinion, though, respondent did not meet minimum parenting standards, even during the time periods when respondent did well, because the length of time that respondent was stable was very short-lived and only lasted about two months.

¶ 34    As for respondent's visits with the children, Donaldson indicated, although somewhat implicitly, that the quality of those visits varied greatly depending upon whether respondent was taking her medications. If respondent was on her medicine, the visits went very well—

20

respondent would have dinner ready for the children, activities planned, the house clean, and would not make any negative statements during the visits. If respondent was not taking her medications, however, the visits did not go so well and would have to be cut short at times for such reasons as respondent appearing to be drunk; respondent falling in front of, and scaring, the children; and respondent pulling T.W.'s hair in effort to discipline T.W. On other such occasions, respondent was not prepared for her visits—her apartment was messy and she did not have any food or activities planned for the children—or she was argumentative with visit supervisors.

¶ 35    In October 2018, respondent was doing so well that her visits were changed from supervised to unsupervised, the length or number of her visits was extended, and she was allowed to take C.R. home from the hospital after he was born. Unfortunately, however, respondent's progress suffered a setback shortly thereafter when the police were called to her apartment because she appeared to be highly intoxicated while acting as C.R.'s caregiver. After that point, respondent's visits were changed back to supervised and had remained that way ever since. Following DCFS taking C.R. into care, respondent missed multiple visits with the children because she was either sick or just would not show up. Eventually, respondent was told that if she did not give 24 hours advance notice of a cancelation, the visits would not be rescheduled. When respondent was doing well (before C.R. was taken into care), she was allowed three visits per week unsupervised. Visits were later reduced to two supervised visits per week. After additional problems occurred, the visits were moved from respondent's apartment to the visit supervisors' location.

¶ 36    With regard to respondent's mental health, initially it was recommended that respondent obtain a mental health assessment. Respondent did so, and it was recommended that she obtain a

21

psychological evaluation with medication management and therapy services. Respondent complied. In 2016, respondent started therapy and medication management at the Robert Young Center. She eventually left Robert Young and started participating in therapy and medication management at Transitions. Respondent had been with Transitions for the entire time that Donaldson had been the caseworker. According to Donaldson, respondent's follow-through with therapy at Transitions was sporadic and there were a few six-month periods where respondent had missed half of the appointments that were scheduled, saying that she was sick, did not feel well, did not have transportation, or that she forgot about the appointment. Despite those absences, however, respondent was never discharged from Transitions.

¶ 37      In addition to the missed appointments, respondent had been hospitalized for various mental health issues on a few occasions during the existence of the case. Donaldson stated that at times, emergency personnel had to be called to respondent's apartment complex because respondent was acting aggressively toward others or was engaging in strange behavior, such as yelling, stating that someone was trying to kill her, or thinking that her children had been killed. In May 2019, respondent was hospitalized after she had claimed that she had seen on television and had heard from her neighbors that her children had been killed. In addition, a few months before the current hearing, respondent was hospitalized again because she thought that something had happened to her children. Respondent did well for a few months at one point, and Donaldson thought that maybe respondent had been taking her medications and was starting to attain the stability that was needed to change the direction of the case. Unfortunately, "something else" would always happen, and respondent would become unstable again.

¶ 38      As to respondent's mental-health diagnoses and medications, Donaldson testified that respondent had initially been diagnosed with anxiety disorder and was later diagnosed with

22

bipolar and schizoaffective disorder. More recently, respondent had been diagnosed again with bipolar and with psychosis. Donaldson stated further that respondent's mental-health medications had been changed over the years as different diagnoses had been made. Although Transitions would test respondent to determine if she was taking the prescribed medications, they would not share those results with Donaldson because respondent had not signed the appropriate consent form. Thus, Donaldson could never truly verify whether respondent had been compliant with her medications. Donaldson would check respondent's medications during home visits and would question respondent about when she was supposed to take the medications, and respondent would always know when the medications were supposed to be taken.

¶ 39    In addition to or as part of respondent's mental health issues, Donaldson noticed during the course of the case that respondent would frequently have difficulty retaining information that she had just been given a few days or a week earlier. Respondent's inability to retain information caused Donaldson and the visitation supervisors to have concerns over respondent's ability to safely parent the children.

¶ 40    With regard to respondent's relationship with Christian, C.R.'s father, Donaldson stated that there were domestic violence concerns before she was involved in the case. In September 2018, when Donaldson became the caseworker, respondent already had an active order of protection against Christian. Despite having the order of protection, respondent started asking Donaldson questions about whether Christian could be involved with C.R. and whether Christian could come to respondent's apartment to see C.R. Donaldson explained to respondent that Christian was not allowed to be at respondent's apartment during visits and that Christian would have to contact DCFS with any questions he had about his involvement with C.R. Months later, in summer 2019, respondent dropped her order of protection against Christian, saying that she

23

and Christian were going to co-parent, that they were going to be a family, that Christian was doing well, and that they wanted to be together.

¶ 41 According to Donaldson, about every two weeks, the status changed as to whether respondent and Christian were in a relationship. Respondent was expected to, and did, satisfactorily engage in domestic violence services. Despite having done so, respondent continued to have domestic violence incidents with Christian. Donaldson received numerous reports from the police regarding fights between respondent and Christian or incidents where the police were called to respondent's apartment. In February 2019, respondent came to Donaldson's office with a black eye and told Donaldson that Christian had hit her with a phone. During the meeting, Christian called respondent on the phone and respondent and Christian were yelling and screaming at each other. A couple of weeks later, respondent and Christian got back together. Respondent would tell Donaldson that things were better between she and Christian; then she would call and say that they had gotten into another argument. Christian was banned from the apartment complex where respondent lived because of the various incidents between them and was also asked not to come to respondent's work. In about April 2020, respondent reported to Donaldson that Christian had videotaped her while at his apartment and said that if she did not do what he wanted, he was going to show the tape to Donaldson to prove that they were still in a relationship and had been around each other. In all of the incidents, respondent reported that Christian was the aggressor.

¶ 42 Finally, with regard to respondent's performance as a whole during the course of the case, it was Donaldson's opinion, based upon her own experience with the case and her review of respondent's case file, that respondent had failed to make reasonable efforts toward correcting the conditions that were the basis for the removal of the children from the home and had failed to

24

make reasonable progress toward returning the children to the home during any of the nine-month periods listed in the termination petitions (the amended petitions as to T.W., S.E., and M.E. and the original petition as to C.R.). According to Donaldson, respondent loved and showed affection for her children and had a bond with her three older children but never got to the point where her children felt safe enough to be in her presence full time. Donaldson did not observe a strong bond, however, between respondent and C.R. since C.R. was put into foster care at such a young age. C.R. had more of a bond with the other three children than with respondent.

¶ 43     At the conclusion of the parental fitness hearing, after all of the evidence and arguments had been presented, the trial court found that all three grounds of parental unfitness had been proven by the State by clear and convincing evidence. The trial court concluded, therefore, that respondent was an unfit parent/person. In reaching that conclusion, the trial court commented that: (1) as to responsibilities and efforts, respondent had failed to live up to her responsibilities in the case in that she had missed several therapy appointments, had been inconsistent with her medications, had started drinking and having numerous domestic violence issues, had failed to follow her therapist's advice, and could barely function to take care of herself when she was off of her medication; (2) respondent's progress in the case throughout the time periods specified had been sporadic as respondent would make some progress and then would fall back; (3) respondent was no better off now than she was when she started this case, nor was she fit to be a parent, and had not attained the level of competency necessary to be a parent.

¶ 44     A best interest hearing was held the following month. Respondent was present in court for the hearing and was represented by her attorney. A best interest report had been prepared by the caseworker in preparation for the hearing and had been filed with the court. In her report, the caseworker discussed the history of the case and the current status of the children. The

25

caseworker noted in her report that respondent's mental health had been of great concern during the entirety of the case, that respondent did not fully understand her mental and therapeutic needs, that respondent had struggled to follow through with recommendations, and that respondent had not been able to demonstrate that she could parent her children on a full-time basis.

¶ 45    With regard to the children, the caseworker indicated in the report that T.W. was 14 years old,[3] had been in foster care for approximately 5 years, and had been in the same foster home since August 2020. The foster parents had been meeting T.W.'s basic needs of food, clothing, shelter, and safety and were committed to providing permanency for T.W. The foster parents were supportive of T.W.'s needs and assured that T.W. attended therapy as scheduled, advocated for T.W.'s educational needs, kept T.W. active in the extracurricular activities that T.W. enjoyed, and provided the structure and consistency that T.W. required. T.W. had adjusted well to her foster home and had bonded to her foster parents. T.W. attended school, was doing well academically, was active in sports, and wished to continue pursuing her talents beyond high school.

¶ 46    As for S.E., the caseworker stated in the report, that S.E. was 7 years old, had been in foster care for approximately 5½ years, and had been in the same foster home since August 2020. The foster parents had been meeting S.E.'s basic needs of food, clothing, shelter, and safety and were committed to providing permanency for S.E. S.E. had adjusted well to her foster placement, seemed to be a happy child, was very comfortable with her foster parents, and easily approached her foster parents when she wanted her needs met. S.E. appeared to be very attached

_____

[3] From the date of birth provided, it appears that T.W. was actually 15 years old at the time the best interest report was prepared.

26

to her foster parents, and her foster parents appeared to be very attached to S.E.  S.E. attended school and was doing well.

¶ 47   With regard to M.E., the caseworker noted in her report, that M.E. was 6 years old, had been in foster care for approximately 5½ years, and had been in the same foster home since August 2020.  The foster parents had been meeting M.E.'s basic needs of food, clothing, shelter, and safety and were committed to providing permanency for M.E.  The foster parents were supportive of M.E.'s needs and ensured that M.E. attended therapy as scheduled, advocated for M.E.'s educational needs, kept M.E. active in functions that M.E. enjoyed, and provided M.E. with the structure and consistency that she required.  M.E. had adjusted well to her foster placement and had bonded to her foster parents.  M.E. attended school and was doing well.

¶ 48   As for C.R., the caseworker indicated in her report that C.R. was two years old, had been in foster care since he was three weeks old, and had been placed with his paternal grandmother the entire time.  C.R.'s grandmother had been meeting C.R.'s basic needs of food, clothing, shelter, and safety and was committed to providing permanency for C.R.  C.R. thought of his grandmother as his parent and had adjusted well in his grandmother's care.  C.R. appeared to be very attached to his grandmother, and his grandmother appeared to be very attached to him.  C.R. was in good health and was a very active and curious child.

¶ 49   Based upon the best interest of the children, the caseworker recommended in her report that respondent's parental rights be terminated.

¶ 50   During its portion of the hearing, the State called the caseworker, Lela Donaldson, to testify as its only witness.  In addition to the information provided in the report, Donaldson stated that T.W., S.E., and M.E. were together in the same foster home.  The foster mother was a stay-at-home mom, and the foster father worked in a warehouse.  The foster parents had children of

27

their own and another foster child as well. The foster parents lived in a four-bedroom home that had two bathrooms. T.W. had her own room in the foster home, and S.E. and M.E. shared a room. The foster home was in a nice neighborhood and had a big yard where the children could play when the weather was nice. The foster parents were involved with the children and took the children on several vacations. The foster parents were family oriented, and the children had a lot of family support. Although the children had not been in that particular placement for very long, they had transitioned very well into the family. The foster parents had four older children: two that they adopted and two that were their biological children. The older children understood how important it was to have the type of supportive family that they had, despite any type of differences. The extended family had accepted the inclusion of the children in various family activities. The children had become very close to the foster parents in a short time and referred to the foster parents as "Mom" and "Dad." The foster parents did not currently have a relationship with respondent, but respondent continued to talk to the children on T.W.'s phone, and Donaldson anticipated that the children would continue to do so, even if the foster parents adopted the children. The foster mother felt that it was important for the children to continue to have a relationship with respondent, and the foster parents allowed the children to spend time with respondent's extended family (respondent's cousins).

¶ 51       As for C.R., the caseworker testified that C.R.'s grandmother had just recently purchased a five-bedroom home and had plenty of space. The grandmother had three children of her own in the home, in addition to C.R. C.R. has his own room, which had been decorated to his liking. C.R. was very cheerful and happy and had the support of extended family. The older children in the home helped out by watching C.R. when the grandmother had to work. The extended family had accepted C.R. being in the home and had also accepted that C.R. might become a permanent

28

member of the home. Donaldson had no concerns about the grandmother's ability to provide for C.R. and to meet C.R.'s needs. The grandmother had maintained a relationship with C.R.'s father (the grandmother's son), who was currently incarcerated, and also had a "pretty good" relationship with respondent. The grandmother and respondent would talk on the phone and over Facetime. Respondent also talked to C.R.'s aunts as well. Through those conversations, respondent kept informed as to how C.R. was doing. Donaldson anticipated that the grandmother's contact with respondent would continue if the grandmother adopted C.R.

¶ 52      When Donaldson was asked during her testimony why she believed it was in the children's best interest to terminate respondent's parental rights, she responded that it had been 5½ years (since S.E. and M.E. were taken into care) and respondent had not been able to correct the issues that brought the children into care. In addition, respondent's mental health issues had continued to affect the case as time went on. Donaldson acknowledged in cross-examination, however, that the children were bonded to their mother and that respondent's parenting during the majority of the visits as a whole was appropriate.

¶ 53      During her portion of the hearing, respondent called two witnesses to testify and also testified in her own behalf. Christian's aunt, Jennifer Aquirre, testified for respondent that she had known respondent for about three years and had briefly observed respondent with C.R. shortly after C.R. was born. In Aquirre's opinion, respondent had bonded very well with, and was very protective of, C.R. Respondent had interacted appropriately with C.R. and had all of the necessary supplies to care for C.R. Respondent had tried to maintain contact with C.R. since that time and had visits, calls, or video chats with C.R. Aquirre never doubted that respondent loved her children very much.

29

¶ 54       Renee Samuel testified for respondent that she had dated respondent's uncle and was like an aunt to respondent. Samuel had known respondent for many years (more than 10), from the time that respondent was 12 years old. Over the years, Samuel had seen respondent interact with her children. The last time was about eight years ago. Respondent's parenting was appropriate, and the children were bonded to respondent. Samuel believed that respondent loved her children very much.

¶ 55       Respondent testified at the best interest hearing that she loved her children and that her children loved her and were bonded to her. During the course of her case, respondent was scared to stand up for herself and to voice her opinion because when she did so, the visitation supervisors and the parenting coach would threaten to cancel her visits. Respondent felt that the parenting coach and the visit supervisors put ideas into the children's heads against respondent. Respondent believed that her children wanted to come home and to live with her. According to respondent, her children had always told her that. Respondent stated that she was ready to have the children returned to her. Respondent believed that she would be able to raise the children in a culturally sensitive way, showing them their past history and their future.

¶ 56       Following the presentation of the evidence, the trial court heard the arguments of the parties' attorneys and of the GAL. The State argued for termination of respondent's parental rights. Respondent's attorney argued against termination, stating that the evidence showed that respondent loved the children and that the children were bonded with respondent. The GAL indicated that she believed it was in the best interest of the children to terminate respondent's parental rights and commented upon the strength of the children's current placements.

¶ 57       After considering the evidence presented and the arguments, the trial court made its ruling. The trial court found by a preponderance of the evidence that termination of respondent's

parental rights was in the best interest of the children. In so finding, the trial court noted, among other things, that it did not think after 5½ years in care, another change in placement would do well for the emotional and psychological well-being of the children. The trial court terminated respondent's parental rights to the children, set the children's permanency goal to adoption, and named DCFS as the guardian of the children with the right to consent to adoption.[4] Respondent appealed.

¶ 58                                   II. ANALYSIS

¶ 59                                   A. Parental Unfitness

¶ 60          As her first point of contention on appeal, respondent argues that the trial court erred in finding her to be an unfit parent/person. More specifically, respondent asserts that the State failed to sufficiently prove any one of the three alleged bases of parental unfitness and that the trial court's conclusion to the contrary was against the manifest weight of the evidence. We focus solely upon the allegation that respondent failed to maintain a reasonable degree of responsibility toward the children's welfare since it is dispositive of our issue here. As to that allegation, respondent asserts that under the circumstances she was operating (mental health difficulties, violent relationships, and financial problems), she maintained a reasonable degree of responsibility toward the welfare of the children. In making that assertion, respondent notes that she found employment where and when she could to maintain a source of income, that she continued to address perceived deficits in her parenting skills by utilizing the services offered to her and by implementing the lessons she had learned in those services during her visits with the children, and that she made significant improvement in how she dealt with her mental health

---

[4] During the course of the proceedings in this case, the parental rights of all three of the fathers involved were terminated, either based upon a finding of parental unfitness or a surrender of parental rights.

31

issues and in the areas of housing and employment.  Thus, respondent contends that she made a good-faith effort to maintain a sense of responsibility toward the welfare of the children. According to respondent, the trial court reached the wrong conclusion because it focused upon the things that remained for respondent to complete instead of focusing upon respondent's efforts to address the issues in front of her.  For all of the reasons stated, respondent asks that we reverse the trial court's finding of parental unfitness and remand this case for further proceedings.

¶ 61     The State argues that the trial court's finding of parental unfitness was proper and should be upheld.  The State asserts that respondent failed to maintain a reasonable degree of responsibility for the children's welfare by refusing to consistently address her mental health issues, which she had since the beginning of the case; by failing to consistently take her medications; and by failing to consistently attend her mental health counseling sessions.  In making that assertion, the State points out that respondent was capable of taking her medications and stabilizing her mental health and that her refusal to do so cost respondent her employment, her housing, and the custody of her children.  The State asks, therefore, that we affirm the trial court's finding of parental unfitness.

¶ 62     The involuntary termination of parental rights is governed by the provisions of both the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq*. (West 2018)).  See *In re D.T.*, 212 Ill. 2d 347, 352 (2004).  In the first stage of termination proceedings in the trial court, the State has the burden to prove the alleged ground of parental unfitness by clear and convincing evidence.  See 705 ILCS 405/2-29(2) (West 2018); *In re C.W.*, 199 Ill. 2d 198, 210 (2002).  The proof of any single statutory ground will suffice.  750 ILCS 50/1(D) (West 2018); *C.W.*, 199 Ill. 2d at 210.  A trial court's finding of parental unfitness is given great deference and will not be reversed on appeal

32

unless it is against the manifest weight of the evidence; that is, unless it is clearly apparent from the record that the trial court should have reached the opposite conclusion or that the conclusion itself is unreasonable, arbitrary, or not based on the evidence presented. *In re C.N.*, 196 Ill. 2d 181, 208 (2001); *In re A.M.*, 358 Ill. App. 3d 247, 252-53 (2005); *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004).

¶ 63    Under section 1(D)(b) of the Adoption Act, a parent may be found unfit if he or she fails to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. 750 ILCS 50/1(D)(b) (West 2018). Because the language of the statute is written in the disjunctive, any one of the three grounds listed—interest or concern or responsibility—may by itself constitute a basis for unfitness. 750 ILCS 50/1(D)(b) (West 2018); *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a child's welfare, the trial court will consider the parent's efforts to visit and maintain contact with the child, along with other indicia, such as inquiries into the child's welfare. *Id.* Whether the parent has completed service plans may also be considered as evidence of a parent's interest, concern, or responsibility. *Id.* In making its determination, the trial court must focus on a parent's efforts, not on whether the parent's efforts were successful. *Id.* In addition, the trial court must examine the parent's conduct with regard to the child in the context of the circumstances in which that conduct occurred. *Id.* Thus, problems that the parent faces, such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues, are relevant. *Id.* It must be remembered, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *Id.* To the contrary, the interest, concern, or responsibility must be objectively reasonable. *Id.* In determining whether a parent has failed to maintain a

33

reasonable degree of interest, concern or responsibility for a child, the trial court will consider the parent's conduct during the entire postadjudication period, not just the parent's conduct during the service plan. See *In re Jason U.*, 214 Ill. App. 3d 545, 552 (1991).

¶ 64    After having reviewed the record in the present case, we find that the trial court's determination—that respondent was an unfit parent/person because she had failed to maintain a reasonable degree of responsibility for the welfare of the children—was well supported by the evidence. There can be no dispute that the heart of this case was respondent's ability to maintain her mental health. The evidence presented at the parental fitness hearing showed that respondent clearly had the ability to do so, and at times did so, by consistently taking her medications and by attending mental health counseling sessions on a regular and consistent basis. Unfortunately for respondent, those periods were relatively short in duration. Indeed, the record in this case shows that as a whole, over the 5½ year lifespan of this case, respondent failed to consistently take her medications and failed to consistently attend counseling sessions and, as a direct result, went back and forth between periods of mental stability and mental instability. During the periods of instability, respondent's efforts as to other requirements of the service plan suffered as well, as respondent frequently lost her job, acted strangely at visits with her children, and struggled during parenting training. Respondent's assertions to the contrary are simply not supported by the record. We, therefore, agree with the State that by failing to consistently address her mental health issues, respondent failed to maintain a reasonable degree of responsibility for the welfare of her children. The evidence presented at the parental fitness hearing in this case amply supported the trial court's finding in that regard. See 750 ILCS 50/1(D)(b) (West 2018); *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. Thus, we cannot conclude that the trial court's

34

determination of parental unfitness was against the manifest weight of the evidence.  See *C.N.*, 196 Ill. 2d at 208; *A.M.*, 358 Ill. App. 3d at 252-53; *Tiffany M.*, 353 Ill. App. 3d at 889-90.

¶ 65                                B. Best Interest

¶ 66        As her second point of contention on appeal, respondent argues that the trial court erred in finding that termination of parental rights was in the best interest of the children.  Respondent asserts that the trial court's finding in that regard was against the manifest weight of the evidence as the evidence in this case showed that respondent and her children shared a strong bond; that respondent loved her children; and that as recently as April 2020, respondent had made satisfactory progress in the areas of mental health/therapy, housing, employment, and domestic violence.  In making that assertion, respondent acknowledges that the need for permanency is a factor in the analysis but points out that permanency, by itself, is not a conclusive factor, and in this case, is even less of a factor as to C.R. who was of a young age and had not been in care as long as the other children.  Respondent asserts further that she should not be punished for things that are out of her control, such as delays caused by the pandemic, the fact that she had a mental illness, or the fact that she had been a victim of domestic violence.  For all of the reasons stated, respondent asks that we reverse the trial court's best interest determination and remand this case for further proceedings.

¶ 67        The State argues that the trial court's best interest finding was proper and should be upheld.  The State asserts that a review of the evidence presented in this case and the statutory best-interest factors shows that the trial court's finding was not against the manifest weight of the evidence.  In making that assertion, the State recognizes that respondent periodically made progress in this case.  The State points out, however, that by the time of the parental fitness hearing, respondent had stopped taking her medications, had lost her apartment, and had lost her

35

job—none of which were caused by the pandemic. In addition, the State maintains, although a relationship still existed between respondent and her children, the statutory best interest factors weighed in favor of termination. For all of the reasons set forth, the State asks that we affirm the trial court's best interest determination.

¶ 68    In a termination proceeding, once the trial court finds that a parent is unfit as defined in section 1(D) of the Adoption Act, the trial court must then determine, pursuant to the Juvenile Court Act, whether it is in the minor's best interest to terminate parental rights. See 705 ILCS 405/2-29(2) (West 2018); *Tiffany M.*, 353 Ill. App. 3d at 891. The burden of proof in the trial court is upon the State to show by a preponderance of the evidence that termination is in the minor's best interest. *Tiffany M.*, 353 Ill. App. 3d at 891. The trial court's ruling in that regard will not be reversed on appeal unless it is against the manifest weight of the evidence; that is, unless it is clearly apparent from the record that the trial court should have reached the opposite conclusion or that the conclusion itself is unreasonable, arbitrary, or not based on the evidence presented. *Tiffany M.*, 353 Ill. App. 3d at 889-90.

¶ 69    In a best interest hearing, the focus of the termination proceeding shifts to the child, and the parent's interest in maintaining the parent-child relationship must yield to the child's interest in having a stable and loving home life. *D.T.*, 212 Ill. 2d at 364. The issue is no longer whether parental rights can be terminated but, rather, whether in the child's best interest, parental rights should be terminated. See *id*. In making a best interest determination, the trial court must consider, in the context of the child's age and developmental needs, the numerous statutory best interest factors listed in section 1-3(4.05) of the Juvenile Court Act. See 705 ILCS 405/1-3(4.05) (West 2016); *Tiffany M.*, 353 Ill. App. 3d at 892-93. Some of those factors include the child's physical safety and welfare, the development of the child's identity, the child's background and

36

ties, the child's sense of attachment, the child's need for permanence and stability, and the preferences of the persons available to care for the child. See 705 ILCS 405/1-3(4.05) (West 2018); *Tiffany M.*, 353 Ill. App. 3d at 892-93. The trial court may also consider the nature and length of the child's relationship with the current caretaker and the effect that a change in placement would have on the child's emotional and psychological well-being. *Tiffany M.*, 353 Ill. App. 3d at 893. Although the trial court is required to consider the statutory factors in making its best-interest determination, it is not required to articulate any specific rationale for its decision. *Id.*

¶ 70    In the present case, after having reviewed the record, we find that the trial court's best interest determination (that it was in the children's best interest to terminate respondent's parental rights to all of the children) was not against the manifest weight of the evidence. The evidence presented at the best interest hearing showed that T.W. was 15 years old, S.E. was 7 years old, M.E. was 6 years old, and C.R. was two years old. The children had been in care anywhere from 2 years (C.R.) to 5½ years (S.E., and M.E.). The older children (T.W., S.E., and M.E.) had been placed in the same non-relative foster home since August 2020, and C.R. had been placed in the home of his paternal grandmother since shortly after his birth. The children had loving relationships, and had bonded, with their foster parents. The children were doing well in their foster homes, were involved in school and extracurricular activities (the older children), and were having all of their needs met by the foster parents. T.W., the oldest of respondent's four children, had expressed to the trial court her desire to remain in the foster home and to not be returned to respondent. Both of the foster homes had at least one other child in the residence; were willing to provide permanency to respondent's children; and were willing to allow, or at least consider, letting the children maintain a relationship with respondent. In addition, it was

37

the opinion of the caseworker and the GAL that termination of respondent's parental rights was in the best interest of the children, and the trial court specifically noted that it did not think another change in placement after 5½ years in care would do well for the emotional and psychological well-being of the children. The trial court's best interest determination in this case was well supported by the evidence and, based upon the standard of review, must be affirmed. See *Tiffany M.*, 353 Ill. App. 3d at 889-90.

¶ 71                                    III. CONCLUSION

¶ 72        For the foregoing reasons, we affirm the judgment of the circuit court of Rock Island County.

¶ 73        Affirmed.